# In the United States Court of Federal Claims

|  |  |
|---|---|
| MARIO A. MANAGO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 22-629C |
| v. ) | |
| ) | (Filed: February 21, 2023) |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

Carol Anne Thompson, The Federal Practice Group, Washington, D.C., for Plaintiff.

Patrick Angulo, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were William J. Grimaldi, Assistant Director, Patricia M. McCarthy, Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General, for Defendant. Maj. Scott W. Medlyn, Military Personnel Litigation Branch, Civil Law and Litigation Domain, United States Air Force, Joint Base Andrews, MD, Of Counsel.

**OPINION AND ORDER**

**KAPLAN, Chief Judge.**

This military pay case is before the Court on the government's motion to dismiss and the parties' cross-motions for judgment on the administrative record. The Plaintiff, Mario A. Manago, was administratively separated from the Air Force in 2017 as a consequence of a demotion that reduced him in rank from an E-5 Non-commissioned Officer to an E-4 Senior Airman. The Air Force based his demotion on a series of letters of reprimand ("LORs") and a letter of counseling ("LOC"). Mr. Manago, who is African American, characterizes the LOC, LORs, and administrative demotion as unjustified and motivated by racial animus.

Mr. Manago's appeal of his demotion to the Air Force Board for the Correction of Military Records ("AFBCMR" or "the Board") was unsuccessful. The Board concluded that the administrative actions were justified in light of his conduct, and that he had not proven by preponderant evidence that he was a victim of racial discrimination.

In this action, Mr. Manago contends that the Board's decision upholding his administrative demotion was arbitrary, capricious, and unsupported by substantial evidence. He alleges that the discipline imposed on him was unduly harsh, and that, in considering his race discrimination allegations, the Board gave insufficient weight to certain public reports identifying racial disparities in the military justice system. Mr. Manago has also filed a motion to supplement the administrative record with two additional reports authored by the Air Force's

Inspector General ("IG") and the transcript of a congressional hearing that discussed racial disparities in the administration of discipline in the military services.

The government, for its part, has moved to dismiss the case pursuant to Rule 12(b)(1) or, in the alternative, Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). It contends that the Court lacks jurisdiction to consider claims of racial discrimination in the imposition of discipline by the Air Force and/or that Mr. Manago's claims that the letters of reprimand and letter of counseling he received were unwarranted are not justiciable.

Oral argument was heard on the pending motions on February 9, 2023. For the reasons set forth below, the government's motion to dismiss and Plaintiff's motion to correct and/or supplement the record are **DENIED**. Plaintiff's motion for judgment on the administrative record is **DENIED**, and the government's cross-motion for judgment on the administrative record is **GRANTED**.

## BACKGROUND

### I.     Facts

Plaintiff Mario A. Manago enlisted in the Air Force in June 2004 and served as an active-duty member until he was involuntarily discharged on June 24, 2017. Admin. R. ("AR") 41, ECF No. 6. He obtained the rank of Staff Sergeant in 2009, AR 5, and in 2011, Mr. Manago was transferred to McGuire Air Force Base, where he served in three different commands: (1) the 817th Global Mobility Squadron from September 2011 to January 2015; (2) the 621st Contingency Response Squadron from January 2015 to February 2016; and (3) the 305th Aerial Port Squadron ("305th APS" or "305th") from February 2016 until June 2017, AR 43.

A month after he transferred to the 305th, Mr. Manago received the first in a series of disciplinary letters that ultimately formed the basis for his reduction in rank which led to his involuntary separation. First, on March 16, 2016, his superior officer, Senior Master Sergeant ("SMSgt") Ahlstrom, issued him an LOC because Mr. Manago had allowed the balance on his Government Travel Card to become more than thirty days past due. AR 271–72 (Mar. 16, 2016 LOC). In the LOC, SMSgt Ahlstrom advised that the overdue balance violated Air Force regulations, that as a non-commissioned officer he was expected to "set the standard" for the Airmen in his charge, and that his "failure to take care of the delinquent bill is in direct violation of the responsibilities that have been placed before [him] and will not be tolerated." AR 271 ¶ 2.

On May 24, 2016, SMSgt Ahlstrom issued Mr. Manago an LOR that arose out of an investigation finding that, on May 19, 2016, Mr. Manago "acted in a disrespectful manner to a retired Senior Non-Commissioned Officer" in violation of Air Force standards. AR 262 ¶ 1. Specifically, according to the retired Senior Officer, while preparing for the boarding of a plane at the 305th Passenger Terminal, he told Mr. Manago that he did not want to get in the line until it became shorter. AR 265 ¶ 4. Mr. Manago allegedly responded with words to the effect that the Senior Officer would "get in line because I told you to." Id. The Senior Officer filed an official complaint regarding his treatment. Id. ¶ 5.

No one on the scene heard the interaction between Mr. Manago and the Senior Non-commissioned Officer because, in SMSgt Ahlstrom's assessment, the other passengers were

gathered at the customer service counter away from the alleged conversation. AR 80–81 (Ahlstrom Test. at 7:15–16, 7:25–8:5). SMSgt Ahlstrom nonetheless upheld the LOR over Mr. Manago's protests. AR 263. He credited the Officer's allegations regarding Mr. Manago's remarks, because the Officer had "stayed back to address this issue even though he could have gotten onto a different flight to his destination." AR 80 (Ahlstrom Test. at 7:19–22).

A little more than a month later, on June 28, 2016, Mr. Manago was again reprimanded. This time, the reprimand was for being late to appear at his place of duty on both June 2 and June 3, 2016. AR 254–55. On this occasion, Mr. Manago admitted to committing the infractions and apologized for his "lack of leadership and time management." AR 256 ¶ 4; see also id. ¶ 2 (Manago's July 1, 2016 Mem. stating, "I was wrong and I accept responsibility for my actions"). Apparently, however, at a meeting between Mr. Manago and Lieutenant Colonel ("Lt. Col.") Flack held the day the reprimand was issued, Lt. Col. Flack informed him that he was considering creating a Control Roster/Unfavorable Information File ("UIF") regarding Mr. Manago's infractions. AR 95 ¶ 2.[1] In his response to the LOR, Mr. Manago expressed concern about the effect of a UIF on his career and advised that it was not necessary to take this additional step to get him to comply with governing standards and directives. AR 256–57.

Notwithstanding his request, within a few days a UIF file was established, and Mr. Manago was placed on a control roster. AR 480 ("[Mr. Manago] received a[n] LOR, dated 28 June 2016[,] and this item was used to establish [a UIF]."). In response, on July 22, 2016, Mr. Manago submitted a memorandum to the 305th APS, complaining about the administrative actions taken against him. AR 95–96 (July 22, 2016 Mem. for 305th APS). With a subject line of "Progressive Discipline," Mr. Manago expressed concerns "about the level of adverse administrative action . . . issued . . . due to the lack of progressive discipline imposed," as well as an allegedly improper use against him of a "Personal Information File" compiled during a previous assignment. Id.

Unable to secure a satisfactory response from his superiors, Mr. Manago scheduled a meeting with Lt. Col. Eric Quidley, Commander of the 305th, at 10 a.m. on August 12, 2016. AR 108 ¶ 8 (Nov. 22, 2016 Manago Mem.). On the day of the scheduled meeting, however, the Staff Sergeant supervising Mr. Manago's duty station was concerned about being short-staffed. AR 106 (Aug. 12, 2016 Mem. for Rec. by SSgt Markis McCollum). At morning stand up that day, he advised the service members on the shift that the day would be "tight" and that they should not attend any personal meetings. Id. At 9:10 a.m., Mr. Manago's civilian supervisor told him of the busy day ahead, id., and, ten minutes later, told him that he would have to reschedule his 10 a.m. meeting with Lt. Col. Quidley, AR 105 ¶ 1 (Aug. 16, 2016 Mem. by John Yesensky, Foreman, Ramp Service).

At 9:30 a.m., Mr. Manago contacted Chief Master Sergeant ("CMSgt") Mitchell Pykosz, requesting to postpone the 10 a.m. meeting with Lt. Col. Quidley. AR 104 ¶ 1 (Aug. 18, 2016

---

[1] A UIF is "an official record of unfavorable information about an individual." Air Force Instruction ("AFI") 36-2907, ch. 1.1.2 (updated Oct. 14, 2022), https://static.e-publishing.af.mil/production/1/af_a1/publication/dafi36-2907/dafi36-2907.pdf. It tracks "administrative, judicial, and non-judicial actions" taken against a service member. Id.

3

Pykosz Mem.). CMSgt Pykosz advised Mr. Manago that he would not do so, that the meeting was mandatory, and that he needed to be there at 10 a.m. Id. Notwithstanding these instructions, Mr. Manago arrived at the meeting six minutes late, i.e., 10:06 a.m. AR 108 ¶ 10 (Nov. 22, 2016 Manago Mem.).

On August 23, Lt. Col. Quidley told Mr. Manago that he was considering imposing an Article 15 non-judicial punishment on him based on his late arrival at the August 12, 2016 meeting. Id. Mr. Manago declined Article 15 non-judicial punishment and instead demanded trial by court-martial. AR 108 ¶ 11, 393.[2] Accordingly, the charges arising out of his failure to arrive at the August 12, 2016 meeting on time were referred to a special court-martial on October 13, 2016. AR 38–39 (Court-Martial Charge Sheet). Ultimately, on May 2, 2017, Mr. Manago was convicted for his late arrival at the August 12 meeting, and a reprimand was imposed. AR 392–93.

In the meantime, on September 15, 2016, an incident occurred that resulted in the issuance of another LOR. According to a Memorandum for the Record that Mr. Manago prepared that day, he had experienced a conflict with a "Mr. Jones," who was apparently a coworker. AR 111–12 (Sept. 15, 2016 Manago Mem. for Rec.). In the memorandum, Mr. Manago stated that Mr. Jones had berated him for continuing to operate his forklift while the national anthem was playing. AR 111 ¶ 2. Mr. Manago stated that he did not hear the anthem because of the noise from the forklift and the ear plugs he was wearing. Id. ¶¶ 1–2. Then, Mr. Manago noted, "in a very loud and judgmental manner [Mr. Jones] began to question [Mr. Manago's] experience about safe forklift operations." Id. ¶ 3. Apparently, Mr. Jones challenged Mr. Manago's understanding of safety regulations because he had failed to turn the engine of his forklift off when he left his seat to move some dunnage that was in front of his tire. Id.

Mr. Manago reported the incident to his command, registering his concern about "the lack of respect and professional courtesy displayed," which he said was his "second negative, disrespectful, and unprofessional interaction with Mr. Jones." AR 111–12 ¶ 4. The memorandum, however, did not have its intended effect. Instead, it led to an investigation which

---

[2] Article 15 non-judicial punishment is a statutorily established non-criminal penalty. Moore v. United States, 956 F.2d 1172, 1172 n.1 (Fed. Cir. 1992) (unpublished table decision) (citing 10 U.S.C. § 815). It "is the least formalized method of military discipline, conducted personally by an accused's commanding officer," instead of before a military court. Id. (citing Dumas v. United States, 620 F.2d 247, 251 (Ct. Cl. 1980)). As such, it is "an informal proceeding in which only limited penalties may be imposed upon a finding of guilt," Martinez v. United States, 333 F.3d 1295, 1299 (Fed. Cir. 2003), for "minor offenses," 10 U.S.C. § 815(b) (listing potential disciplinary punishments for Article 15).

A service member can, however, "demand[] trial by court-martial in lieu of [an Article 15 non-judicial] punishment," like Mr. Manago did here. 10 U.S.C. § 815(a); see also Dumas, 620 F.2d at 251 (noting that failure to demand trial by court-martial "is not a plea of guilty to the described offense(s)" (quoting Air Force Regulation 111-9(6)(h) (July 24, 1974))). This, in essence, gives the commanding officer three options: to proceed with the court-martial, drop the issue entirely, or give a lesser punishment, such as a Letter of Reprimand.

disclosed that Mr. Manago had indeed violated Air Force safety rules, as Mr. Jones had suggested. AR 318 ¶ 1. Mr. Manago then received an LOR for failing to double chock one of the forklift's tires while it was unattended. AR 318–19 (Sept. 28, 2016 LOR).

Finally, in December 2016, Mr. Manago received yet another LOR for two more instances of tardiness, both of which occurred in November 2016. AR 249–50 (Dec. 21, 2016 LOR). The first occurred on November 25, 2016, when he reported late for a shift that was originally supposed to begin at 6:30 a.m. AR 249 ¶ 1. The LOR states that he reported that day at 8 a.m. Id. In his response to this LOR, Mr. Manago stated that others on the shift had received text messages from their supervisor to report at 7:30 a.m. that day. AR 251 ¶ 2 (Dec. 29, 2016 Manago Mem.). According to Mr. Manago, he texted the supervisor at 5:54 a.m. to alert her that he would be arriving after 6:30 a.m. Id. Mr. Manago then claims he arrived at 7:00 a.m. at which time his superior "notified [him that] she had authorized late reporting by an hour" (i.e., at 7:30 a.m.). Id. Nonetheless, Mr. Manago did not deny that he did not arrive until 8 a.m., as the LOR stated. See generally AR 251–52.

The second incident described in the December 2016 LOR occurred five days later, on November 30, when Mr. Manago arrived at 7:00 a.m. instead of 6:30 a.m. as scheduled. AR 249 ¶ 1; see also AR 251 ¶ 3. Mr. Manago did not dispute that he arrived at 7:00 a.m. but claimed that he had received authority to "flex" his hours and schedule so long as he reached twelve hours per day. AR 251 ¶ 3.

In the December 2016 LOR, Lt. Col. Quidley noted that the two infractions appeared to be "the fourth and fifth times since [June 2, 2016] in which [Mr. Manago] absented . . . from [his] place of duty without authority or failed to go to [his] appointed place of duty at the time prescribed." AR 249 ¶ 2. He advised Mr. Manago that "[b]y reporting late to duty on multiple occasions, [he] ha[d] failed to comply with one of the most basic Noncommissioned Officer responsibilities; that is[,] to 'epitomize excellence and lead by example through exhibiting professional behavior.'" Id. His behavior, according to Lt. Col. Quidley, "set a poor example for subordinates and peers alike." Id.

On January 11, 2017, Lt. Col Quidley recommended that Staff Sergeant Manago receive an administrative reduction to the rank of Senior Airman. AR 114–16 (Admin. Demotion of Airmen Mem.). He based the recommendation on the LORs issued on December 21, 2016, September 28, 2016, June 28, 2016, and May 24, 2016, as well as the March 16, 2016 LOC. AR 116. He did not cite the incident in August 2016 where Mr. Manago was six minutes late to a meeting; charges arising out of that incident were still pending in the court-martial proceedings. See id.; AR 392–93.

Mr. Manago was reduced in rank effective February 24, 2017. AR 241. On March 6, 2017, he appealed the demotion, AR 350–53 (Admin. Demotion Appeal), and was unsuccessful, AR 8 (noting that Mr. Manago appealed the administrative demotion, and "the appellate authority denied [his] appeal" on March 17, 2017). On June 24, 2017, Mr. Manago was involuntarily separated from the Air Force. AR 41–42 (Certificate of Release or Discharge From Active Duty). The separation was mandatory because Mr. Manago reached his High Year of

5

Tenure ("HYT") for the rank of Senior Airman, the position to which he had been demoted. See AR 4–5, 698.[3]

## II. Petition to the AFBCMR

On June 21, 2020, some three years after his involuntary separation, Mr. Manago petitioned the AFBCMR to challenge his administrative demotion. AR 19–29 (AFBCMR Petition). In his petition he argued: (1) that his demotion circumvented the Uniform Code of Military Justice in violation of AFI 36-2502; (2) that the demotion was the result of "erroneous uses of LORs, retaliation, and apparent discrimination"; (3) that his treatment at the 305th APS was consistent with reports of racial discrimination in the Air Force; and (4) that he was qualified to serve as a Staff Sergeant, his pre-demotion position. AR 25–28.

The Air Force Personnel Center ("AFPC/JA") provided the Board with an advisory opinion regarding Mr. Manago's petition. AR 397–401. It opined that the demotion did not violate AFI 36-2502, AR 398, and that Mr. Manago's petition and record did not "provide sufficient evidence to indicate [that his] demotion was unjust due to racial discrimination," AR 401. The AFPC/JA noted that the "findings of racial discrimination" upon which Mr. Manago relied, which were prepared by Protect Our Defenders ("POD"), an advocacy group, and by the Government Accountability Office ("GAO"), had revealed disparities among Black and white service members with respect to the number who were investigated and tried at courts-martial, but that neither POD nor GAO determined that the disparities were the result of discrimination. Id. The AFPC/JA observed that the record contained "no evidence other than the GAO . . . and POD report[s], which [made] no causal findings," to indicate that Mr. Manago's demotion was motivated by racial animus. Id. It therefore recommended that the Board deny the petition. AR 398–401.

The Board concurred with the AFPC/JA and denied Mr. Manago's petition. AR 4–13. It explained that "the reasons for the LORs issued by [Mr. Manago's] superintendent and flight commander were valid" and they were "issued in an attempt to correct [Mr. Manago's] behavior." AR 12 ¶ 3. The Board also concurred "with [the] AFPC/JA's assessment that [Mr. Manago] ha[d] provided no evidence [of racial discrimination] other than the GAO . . . and POD report[s], which ma[de] no causal findings even for the service-level disparities, to indicate racial discrimination contributed to his demotion." Id.

## III. The Present Action

On June 7, 2022, Mr. Manago filed his complaint with this court, invoking jurisdiction under the Tucker Act and Military Pay Act for wrongful discharge. Compl. ¶ 6 (citing 28 U.S.C. § 1491(a) and 37 U.S.C. § 204), ECF No. 1. He alleges that "[t]he AFBCMR's determination

---

[3] HYT refers to the maximum number of years a person can serve in the Air Force at any given rank. See AFI 36-3203, Attach. 1 (updated Feb. 23, 2021), https://static.e-publishing.af.mil/production/1/af_a1/publication/afi36-3203/afi36-3203.pdf (defining HYT as "[a] year point at which the Air Force determines an enlisted Airman is ineligible for reenlistment and extension of enlistment due to grade and length of service").

6

that there was insufficient evidence to suggest that Plaintiff's administrative reduction was a result of racial discrimination was arbitrary, capricious, and unsupported by evidence." Id. ¶ 25. The LORs issued against him, he argues, "should have been handled through counseling or other progressive forms of discipline." Id. ¶ 26.  Further, Mr. Manago alleges, "[t]he repeated use of disproportionate punishments was a direct result of racial bias against Plaintiff, an African American service member." Id.  He contends that "[s]ubstantial evidence existed to suggest that Plaintiff's reduction in rank was the direct result of racial bias against African Americans within the military" and that "[t]he AFBCMR's decision to ignore the weight of this evidence and ultimately deny Plaintiff's application was arbitrary, capricious, and unsupported by evidence." Id. ¶ 30.

On October 21, 2022, Mr. Manago filed a motion for judgment on the administrative record ("MJAR") and to supplement the administrative record. See Pl.'s Mot. for J. on the AR and Mot. to Suppl. [hereinafter "Pl.'s Mot."], ECF No. 10. The government filed its motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) or, in the alternative, cross-MJAR on December 20, 2022. See Def.'s Mot. to Dismiss and Cross-MJAR [hereinafter "Def.'s Mot."], ECF No. 11. Mr. Manago filed his reply on January 20, 2023. See Pl.'s Reply, ECF No. 14. The Court held oral argument on February 9, 2023. See Order Setting Oral Arg., ECF No. 15.

## DISCUSSION

### I. Subject-Matter Jurisdiction

As noted, the government has filed a motion to dismiss Mr. Manago's complaint. It contends that the Court lacks jurisdiction to review whether Mr. Manago's involuntary separation from the Air Force was the result of racial discrimination, just as it lacks jurisdiction over claims of racial discrimination arising under Title VII or other civil rights statutes. Def.'s Mot. at 15–16 (citing Baker v. United States, 642 F. App'x 989, 991 (Fed. Cir. 2016) (affirming dismissal of Title VII claims); Cottrell v. United States, 42 Fed. Cl. 144, 149–50 (1998) (dismissing claims under Title VII, the Age Discrimination in Employment Act, and other civil rights laws)). The government's argument lacks merit.

The Tucker Act empowers this court to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). While the Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), it does not confer any substantive rights on a plaintiff, United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation, or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

The Military Pay Act, 37 U.S.C. § 204, is such an independent source of a substantive right to money damages. It "confers on an officer the right to the pay of the rank he was appointed to up until he is properly separated from the service." Holley v. United States, 124

F.3d 1462, 1465 (Fed. Cir. 1997) (quoting Sanders v. United States, 594 F.2d 804, 810 (Ct. Cl. 1979) (en banc)). Accordingly, the Military Pay Act "provides for suit in [the Court of Federal Claims] when the military, in violation of the Constitution, a statute, or a regulation, has denied military pay." Antonellis v. United States, 723 F.3d 1328, 1331 (Fed. Cir. 2013) (quoting Dysart v. United States, 369 F.3d 1303, 1315 (Fed. Cir. 2004)).

Mr. Manago contends that he was wrongfully demoted and then separated from the Air Force as a result of race discrimination and that, as a result, he was denied the pay to which he was entitled under the Military Pay Act. See Compl. ¶¶ 26–30. Further, his allegation that his demotion and separation were based on racial discrimination asserts a violation of a provision of the Constitution—i.e., the equal protection guarantee of the Fifth Amendment. See U.S. Const. amend. V; Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 229–30 (1995) ("[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection."). His race discrimination claims are therefore within this Court's jurisdiction under the Tucker Act. See Berkley v. United States, 287 F.3d 1076, 1083 (Fed. Cir. 2002) (suit under Military Pay Act challenging involuntary separations from the Air Force as violative of equal protection because race and gender were allegedly considered when selecting those who would be separated); see also Woodward v. United States, 871 F.2d 1068, 1070, 1073 (Fed. Cir. 1989) (Court of Federal Claims has jurisdiction under the Tucker Act to consider claim of whether the Navy's discharge of Plaintiff based on sexual orientation violated the First and Fifth Amendments). The government's motion to dismiss Mr. Manago's claims based on lack of subject-matter jurisdiction is therefore denied.

## II.   Justiciability

The government next argues that Mr. Manago's claims are non-justiciable because they involve military discipline. Def.'s Mot. at 17–20. According to the government, a challenge to whether the LORs or LOC Mr. Manago received were warranted, or to the Air Force's "subsequent decision to recommend an administrative reduction in rank," present non-justiciable issues because "a military decision-maker was faced with having to make a discretionary personnel decision." Id. at 18.

The Court agrees with the government that challenges to the propriety of the military's disciplinary decisions are generally not justiciable. But that general rule does not prevent the Court from reviewing a disciplinary decision for conformance with the Fifth Amendment's guarantee of equal protection under the law.

It is well established that "[i]n the military arena, because of the admonition against court interference with military matters . . . justiciability is an especially appropriate inquiry." Roth v. United States, 378 F.3d 1371, 1385 (Fed. Cir. 2004) (citing Orloff v. Willoughby, 345 U.S. 83, 94 (1953)). As the Supreme Court has observed, "judges are not given the task of running the Army." Orloff, 345 U.S. at 93. To the contrary, "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian." Id. at 94. "Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." Id.

8

In light of these principles, "there are 'thousands of [ ] routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with.'" Murphy v. United States, 993 F.2d 871, 873 (Fed. Cir. 1993) (alteration in original) (quoting Voge v. United States, 844 F.2d 776, 780 (Fed. Cir. 1988)). In the Court's view, among these decisions that are beyond its competence is the selection of the appropriate response to instances of tardiness or other infractions and violations of military standards of conduct. See Woodward, 871 F.2d at 1077 (noting that special deference is afforded to the military for matters of "discipline, morale, composition and the like").

The Court's deference to the military with respect to such decisions, however, does not prevent it from reviewing the decisions of the military in response to constitutional equal protection claims. Berkley, 287 F.3d at 1091. "Review of compliance with statute, regulation, and the Constitution is the judicial responsibility." Holley, 124 F.3d at 1468; see also Weiss v. United States, 510 U.S. 163, 194 (1994) (Ginsburg, J., concurring) ("[M]en and women in the Armed Forces do not leave constitutional safeguards and judicial protection behind when they enter military service."). Further, in reviewing Mr. Manago's discrimination claim, the Court will not be weighing in on whether, in its view, the LORs and/or demotion action were reasonable responses to Mr. Manago's tardiness or other alleged misconduct. Rather, the Court will be reviewing the Board's determination regarding whether Mr. Manago showed by preponderant evidence that—were it not for his race—the Air Force would not have taken the same actions. Because the resolution of that issue is within the Court's competence, the Court rejects the government's motion to dismiss based on justiciability.

### III.    Standard of Review

The scope of review of a military correction board's decision is a narrow and deferential one. The Court is "limited to determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (quoting Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983)); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983) (decision of the Board for the Correction of Naval Records is "subject to judicial review" and may be set aside if it is "arbitrary, capricious or not based on substantial evidence").

Application of the arbitrary and capricious standard of review "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." Heisig, 719 F.2d at 1157. And substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Strand v. United States, 951 F.3d 1347, 1351 (Fed. Cir. 2020) (internal quotation omitted). The Court may not "substitute [its] judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig, 719 F.2d at 1156.

### IV.    Merits

Before the Board, Mr. Manago presented several challenges to his administrative demotion. Included among these was his claim that the demotion "was a culmination of

9

erroneous uses of LORs, retaliation, and apparent discrimination," AR 26, and that "[t]he manner in which [he] was treated at the 305th is in line with the findings of racial discrimination by the Air Force in 2017," AR 27. He advised the Board that—although he had never previously attributed his alleged mistreatment to race discrimination—there was now what he called "verified data, by the Air Force none-the-less, that at the time he was encountering the issues with the LORs and facing court-martial, the Air Force was disproportionately sending African-American Airmen to courts-martial and punishing them." Id.

The Board concluded that Mr. Manago had not provided preponderant evidence to substantiate his allegations of race discrimination. See AR 12. Specifically, it stated that "the adverse actions and progressive discipline utilized by the applicant's leadership do not appear excessively severe to suggest reprisal, as the applicant had displayed a pattern of failing to report to appointments and an inability to meet standards as evidenced by several different types of infractions." Id. ¶ 3. And based on what it called a "pattern of misconduct," the Board concluded that "the commander had sufficient reason to demote the applicant when he failed to meet the minimum standards expected of a noncommissioned officer, which by regulations is a reason for administrative demotion." Id. The Board then turned to Mr. Manago's allegation of racial discrimination, and as noted above, the Board stated that it agreed with the "AFPC/JA's assessment that the applicant has provided no evidence other than the GAO testimony and POD report, which make no causal findings even for the service-level disparities, to indicate racial discrimination contributed to his demotion." Id.

In his MJAR, Mr. Manago takes issue with the Board's disposition of his claim of racial discrimination. First, he contends that he "repeatedly received disproportional punishment for minor incidents of 'misconduct' during his time with the 305th APS." Pl.'s Mot. at 2. The Board's disposition of this contention is supported by substantial evidence. Over a ten-month period that began in March 2016, Mr. Manago accumulated four LORs and one LOC. These actions were based on repeated instances of tardiness, the disrespectful treatment of a senior officer, a safety violation, and a failure to timely pay off a government credit card. The Board concluded that the disciplinary actions were not disproportionate to the offenses committed, and this Court has no authority to second-guess that judgment call.

Mr. Manago further contends that the Board did not give adequate weight to certain reports concerning racial disparities in some aspects of the military services' disciplinary practices. See Pl.'s Mot. at 22–25; Pl.'s Reply at 12–14. These include the POD and GAO reports, which he provided to the Board, and certain reports by the Air Force Inspector General, which he did not. The Board, Mr. Manago argues, erred by not recognizing the "causal connection between" his treatment and what he characterizes as the "systemic racism" in disciplinary actions across the Air Force. Pl.'s Mot. at 23.

But neither the POD nor GAO reports purported to identify "systemic racism" as Mr. Manago casually suggests. Rather, they revealed racial disparities in certain aspects of the military justice system, including at the Air Force.

The May 2020 POD report, AR 136–60, is entitled "Federal Lawsuit Reveals Air Force Cover Up: Racial Disparities in Military Justice, Part II." The report contains no data of its own but references a 2017 POD analysis that was based on data that POD secured through FOIA

requests. See AR 140 ("Executive Summary"). According to the 2020 report, the 2017 report revealed that between 2006 and 2015, "Black servicemembers were more likely than White servicemembers to face military justice or disciplinary action." AR 142.

After the 2017 POD report was issued, Congress directed the GAO to conduct a review of data collection and racial disparities in the military. H.R. Rep. No. 115-200, at 126–27 (2017) ("Comptroller General Report on Race Data in the Military Justice System"). The GAO report that followed, which Mr. Manago relied upon before the Board, is entitled "Military Justice: DOD and the Coast Guard Need to Improve Their Capabilities to Assess Racial Disparities." AR 161–93. This report states that data covering fiscal years 2013 through 2017 revealed that Black service members were more likely than white service members to be the subject of recorded investigations and to be tried in general and special courts-martial. AR 176–77.

The GAO report does not address racial disparities in the imposition of administrative discipline. But more importantly, as GAO itself cautioned, the disparities it identified, "taken alone, do not establish whether unlawful discrimination has occurred, as that is a legal determination that would involve other corroborating information and supporting statistics." AR 162; see also AR 165 (observing that GAO "did not identify the causes of any racial disparities" and that "the results of our work alone should not be used to make conclusions about the military justice process").

Consequently, GAO made several recommendations designed to sharpen the analysis of racial disparities and develop plans to address them, including that the military services collect better demographic information about military justice actions. See, e.g., AR 174 (advising "military services to include data about race and ethnicity in annual reports about military justice actions"). It suggested that criteria be established to determine when racial and ethnic disparities should be subject to further review. AR 175. And it recommended that the military conduct further evaluations to identify the causes of any disparities in the military justice system and then take steps to address them as appropriate. AR 190.

The Board concluded that—other than the POD and GAO reports of gross statistical disparities at the service-wide level—Mr. Manago had provided no evidence, direct or circumstantial, to show that racial discrimination contributed to his demotion. He produced no evidence to show, for example, that similarly situated white colleagues in the 305th APS received more favorable treatment at the hands of their superiors when they committed infractions similar to those he committed. Nor did he identify even one white non-commissioned officer with a similar disciplinary history who was not administratively demoted. The Board's decision rejecting his race discrimination allegations was therefore neither arbitrary and capricious, nor contrary to law, but was instead supported by substantial evidence in the record as a whole.

## V.  Request to Supplement/Correct the Administrative Record or, in the Alternative, for a Remand

### A.  Motion to Supplement the Administrative Record

Along with his motion for judgment on the administrative record, Mr. Manago requested leave to supplement the administrative record with several additional documents that he filed as exhibits to his MJAR. Pl.'s Mot. at 20–22. These consist of: (1) the transcript of a June 16, 2020 congressional hearing that concerned racial disparities in the military justice system (Ex. A); (2) a one-page email exchange between Mr. Manago's counsel and Lieutenant General ("Lt. Gen.") Rockwell, the Air Force's Judge Advocate General (Ex. B); and (3) two reports by the Air Force IG concerning a racial disparity review his office conducted (Exs. C and D).[4] Pl.'s Mot. at 21–22.

The Court finds that it would be improper to supplement the administrative record with these documents. As noted above, in military pay cases, the Court's job is to "apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." Walls v. United States, 582 F.3d 1358, 1367 (Fed. Cir. 2009) (citation omitted). Because the Court's review is based on APA standards, its "focal point" is "the administrative record already in existence, not some new record made initially in the reviewing court." Id. (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985)). Permitting parties to add new evidence to the administrative record for the court's consideration risks "convert[ing] the 'arbitrary and capricious' standard into effectively de novo review." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000)).

To avoid these consequences and keep the focus on the administrative record in existence, supplementation is permitted only in cases in which "the omission of extra-record evidence precludes effective judicial review." Id. (quoting Murakami, 46 Fed. Cl. at 735). For example, the Court might approve supplementation of the record where a party challenges the legitimacy of an agency's decision-making process. In that circumstance, documents that were not part of the administrative record may be pertinent to whether the proceedings were conducted properly. See Naval Sys., Inc. v. United States, 153 Fed. Cl. 166, 178 (2021) (supplementation of the administrative record may be appropriate "if the agency deliberately or negligently excluded documents that may have been adverse to its decision" (quoting Nat'l Mining Ass'n v. Jackson, 856 F. Supp. 2d 150, 156 (D.D.C. 2012))).

---

[4] Because the Board's decision is not dated, see AR 4–13, Mr. Manago has also requested that the Court include in the administrative record a copy of the email transmitting the Board's decision to him, which shows the date that the decision was issued, Pl.'s Mot. Ex. E, ECF No. 10-5. The Court concludes that the motion to supplement the record to add this document is unnecessary. The email should be considered part of the record before the Court. Cf. Fed. R. App. P. 16(a) (making agency decision part of the record on review before the court).

The documents that Mr. Manago has asked the Court to add to the administrative record do not concern the Board's decision-making process. They are intended to provide further support for Mr. Manago's claim that he was a victim of discrimination. The principle that judicial review of agency action is confined to the administrative record "exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny." Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989). Mr. Manago's request to supplement the administrative record is therefore denied.

### B.     Motion to Complete the Administrative Record

In his reply, Mr. Manago for the first time argues that the Court should treat his Motion to Supplement the Record with respect to two reports issued by the Air Force IG (Pl.'s Mot. Exs. C and D) as a motion to correct or complete the record. Pl.'s Reply at 4 n.2 (requesting that "the Court consider both completion and supplementation" as to Exhibits C and D). Such a motion "seeks to add documents relevant to the challenged agency decision that were considered by the relevant agency decisionmakers but were not included in the record" provided to the court. Poplar Point RBBR, LLC v. United States, 145 Fed. Cl. 489, 494 (2019). Mr. Manago contends that the IG reports should be treated as though they were already part of the administrative record because they were prepared at the request of the Secretary of the Air Force and published before the Board issued its final decision. Pl.'s Reply at 4.

This argument lacks merit. The administrative record "includes all materials 'compiled' by the agency that were 'before the agency at the time the decision was made.'" James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (internal quotation marks and citation omitted). It encompasses "all documents and materials that the agency 'directly or indirectly considered' . . . [and nothing] more nor less." Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (alterations in original) (quoting Maritel, Inc. v. Collins, 422 F. Supp. 2d 188, 196 (D.D.C. 2006)); see also Animal Legal Def. Fund, Inc. v. Perdue, 872 F.3d 602, 611 (D.C. Cir. 2017) (observing that "typically" included in the administrative record are "the order involved; any findings or reports on which it is based; and the pleadings, evidence, and other parts of the proceedings before the agency" (quoting Fed. R. App. P. 16(a))).

The Court is unaware of any precedent to support Mr. Manago's novel argument that documents become part of the administrative record before an appeals board simply by virtue of being generated by other components of the agency (such as the Inspector General). If Mr. Manago wanted the Board to consider the IG's reports, he had the opportunity to bring them to the Board's attention and try to persuade the Board that they were relevant to, and supportive of, his race discrimination claims. He did not do so and, as a result, the Board did not consider them. Therefore, his request that the reports now be admitted to "complete" the administrative record is denied.

## VI.    Remand

Finally, in his reply brief, Mr. Manago suggests for the first time that—if the Court denies his motion to supplement the administrative record—it consider remanding the case to the

13

Board with instructions that it consider the additional documents. Pl.'s Reply at 9–10. The Court declines to remand the case for two reasons.

First, the documents that are the subject of the motion to supplement were available to Mr. Manago before the Board issued its decision, and yet he failed to introduce them into evidence. "[W]here evidence could have been submitted to a corrections board and was not, the evidence is properly excluded by the Court of Federal Claims." Barnick v. United States, 591 F.3d 1372, 1382 (Fed. Cir. 2010) (citing Walls, 582 F.3d at 1368).

Second and in any event, the documents have little, if any, relevance to the resolution of Mr. Manago's discrimination claim for much the same reasons set forth above with respect to the POD and GAO reports. For example, Mr. Manago cites the transcript of a hearing before the Subcommittee on Military Personnel of the House Committee on Armed Services entitled "Racial Disparity in the Military Justice System—How to Fix the Culture." Pl.'s Mot. Ex. A at 1, ECF No. 10-1. Mr. Manago identifies several passages in the hearing transcript that he believes the Board should be permitted to consider: (1) testimony by retired USAF Col. Don M. Christensen, the POD President, alleging racial disparities in the imposition of discipline in the Air Force, and criticizing the failure of the Air Force to address the issue; (2) remarks by Col. Christensen that—without using Mr. Manago's name—specifically reference and criticize the decision of the Commander of the 305th APS to refer to a special court-martial charges that Mr. Manago had arrived six minutes late to the August 12, 2016 meeting; and (3) a brief colloquy between Representative Speier and a panel of Judge Advocates General from all of the military services during which she asked if "any of you think that someone should be court martialed for being 6 minutes late to a formation meeting," to which Lt. Gen. Rockwell responded, "No ma'am." Pl.'s Mot. at 13–14.

Mr. Manago also offers a one-page email exchange between his counsel and Lt. Gen. Rockwell. In it, counsel noted that since the hearing she had been contacted by "multiple members of the media to broadcast Mr. Manago's story." Pl.'s Mot. Ex. B at 1, ECF No. 10-2. She stated that Mr. Manago wanted to "proceed through the administrative channels outside the media, and would like an opportunity to personally discuss the requested relief with Air Force leadership." Id. She decided to enlist his help, she said, because he had been present at the hearing "in which the JAGs for each service acknowledged that the court-martialing of an Airman for being 6 minutes late to a meeting was likely improper." Id. In his response, Lt. Gen. Rockwell thanked Mr. Manago's counsel for her email, but explained that because the "petition is addressed in the [AF]BCMR process, [he] ultimately will have to advise the Secretary or final decision authority" as the Judge Advocate General. Id. He offered, however, to answer any questions she had about the process. Id.

Neither of these documents sheds any light on whether Mr. Manago's administrative demotion was racially motivated. Col. Christensen's testimony concerned the gross racial disparities identified in the 2017 POD report discussed above and criticisms of the Air Force's alleged lack of transparency and failure to take remedial action to study and address the disparities. The disparities identified did not involve administrative discipline and, in any event, do not establish disparate treatment even as to the types of actions studied.

The hearing transcript also includes Col. Christensen's observations that the decision "2 years ago . . . to prosecute a Black [non-commissioned officer] for being 6 minutes late to work, literally 6 minutes late to a meeting," resulting in "a court-martial conviction" was "a decision that truly should not have been made." Pl.'s Mot. Ex. A at 14. This testimony is also of limited relevance, if any. Mr. Manago's court-martial is not at issue here and, in any event, Col. Christensen did not suggest that the decision to refer him to a court-martial was based on racial discrimination. His concern was about "the optics" of the referral. Id. Indeed, he recognized that such referral was mandatory because Mr. Manago had declined to accept a non-judicial punishment. Id. ("I don't care if it was an Article 15 turndown or not[.]"). Further, Lt. Col. Rockwell's response that it would never be proper to refer a service member to a court-martial based on being six minutes late to a meeting does not reflect any appreciation of the individualized circumstances of Mr. Manago's case.

The Court also does not understand why Exhibit B, the email between Mr. Manago's counsel and Lt. Col. Rockwell, has any relevance at all. The email reflects that Lt. Col. Rockwell thought it improper to have a discussion with Mr. Manago's counsel because it would ultimately be his job to advise the Secretary of the Air Force whether to accept the Board's decision on Mr. Manago's petition. See Pl.'s Mot. Ex. B at 1. Although Mr. Manago suggests that this shows some sinister motive on the part of Lt. Col. Rockwell, see Pl.'s Reply at 6 (describing "Rockwell's assurance that he would appropriately advise the final decision authority" as "bad faith"), in the Court's view, his response to counsel was entirely professional and appropriate.

The third document is a December 2020 Report by the Air Force IG entitled "Report of Inquiry (S8918P) Independent Racial Disparity Review." Pl.'s Mot. Ex. C at 1, ECF No. 10-3; see also id. at 6 (listing disparities between Black and white service members). The fourth document, issued in September 2021, is similarly entitled "Report of Inquiry (S8918P) Disparity Review." Pl.'s Mot. Ex. D at 1, ECF No. 10-4. It was intended to build on the December 2020 report by addressing disparities affecting women, Asian Americans, Native Americans, Pacific Islanders, and Hispanic/Latino racial and ethnic minorities. Id. at 5 (describing the report as "addressing disparities in discipline and opportunities" amongst the aforementioned groups).

The purpose of the December 2020 report was "to assess racial disparity in military discipline processes[,] personnel development[,] and career opportunity." Pl.'s Mot. Ex. C at 4. It concludes that disparities affecting Black service members exist in a number of areas, including "law enforcement apprehensions, criminal investigations, military justice, administrative separations, placement into occupational career fields, certain promotion rates, professional military educational development, and leadership opportunities." Id. at 6.

With respect to administrative disciplinary actions and demotions in particular, the IG found that "young [B]lack enlisted members are almost twice as likely as white enlisted members to be involuntarily discharged based on misconduct." Id. The IG further observed that because such discharges are largely based on letters of reprimand, admonishment, or counseling, the disparity suggested that "young [B]lack service members as a whole may be receiving more administrative disciplinary actions than their peers." Id. at 19. Nonetheless, like the GAO before it, the IG cautioned that "[w]hile the data show racial disparity, it does not indicate causality." Id. at 6; see also id. at 134. "Data alone," the IG explained, "do not address why racial disparity exists in these areas." Id. at 6.

15

Moreover, at the time of his demotion, Mr. Manago was not a "young . . . enlisted member[]." See id. He was a non-commissioned officer at the E-5 level. The IG expressly stated in his report that the findings of disparities in administrative discharges covered members in the E-1 to E-4 category. Id. at 21. Although the review "also looked at administrative discharges for misconduct involving non-commissioned and senior non-commissioned officers . . . there were not enough cases to provide statistical analysis." Id. n.8.

## CONCLUSION

Based on the foregoing, Mr. Manago's motion to supplement or complete the administrative record, ECF No. 10, is **DENIED**. His MJAR, ECF No. 10, is also **DENIED**, and the government's cross-MJAR, ECF No. 11, is **GRANTED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge